Dorothy Emerson STARRETT, Plaintiff in Error,

v.

MIDWEST CITY, Oklahoma, Defendant in Error.

No. A–13116.

Court of Criminal Appeals of Oklahoma.

May 9, 1962.

As Corrected on Denial of Rehearing Sept. 26, 1962.

Jack P. Trezise, Midwest City, for plaintiff in error.

H. Lee Smith and Edward H. Ferrish, Midwest City, for defendant in error.

NIX, Presiding Judge.

Dorothy Emerson Starrett, hereinafter referred to as the defendant, was charged by complaint in the Municipal Court of Midwest City with violation of a city ordinance by being drunk in a public place. The defendant was convicted and appealed her case to the Common Pleas Court of Oklahoma County where the cause was tried De Novo. Defendant was again found guilty and appealed her case to this court.

The defendant advances two assignments of error upon which she relies for reversal.

Defendant first contends that she was denied the right to call her family physician for the purpose of him taking a blood test at her expense, to determine her innocence and that this constitutes a suppression of Evidence and a denial of due process.

Second, that the complaint filed against the defendant was vague, indefinite, uncertain, and did not adequately apprise defendant of the offense with which she was charged.

The assignment of error will be discussed in the order presented. The first contention arises from the following testimony given by Arresting Officer Edgar Messick:

*ON DIRECT EXAMINATION*, the officer was asked and answered:

"Q. Could you tell us in your own words, the circumstances leading up to that arrest from the time you first saw the defendant until you consummated the arrest?

"A. Yes, sir. We observed them standing in front of the Jet Tavern. She was holding him up, attempting to hold him up.

"Q. (By the Court) Holding who up?

"A. Her husband, Arthur A. Starrett. And she was holding an open can of beer in her right hand. We approached the front of the building to talk to them, to *try* to decide how intoxicated they were, and we informed Mr. Starrett that he was under arrest for public drunk, at which time she, Mrs. Starrett, started protesting very loudly, pushing and shoving the officers. And after we went inside the building she continued shoving, pushing, and protesting very loudly. We were going to arrest her husband. We then informed her she was under arrest for public drunk and interfering with an officer.

"Q. After you got her to the station, did you at that time, make any test to determine the degree of intoxication, if any, of the defendant?

"A. *No, sir, we did not.* She was very belligerent and she refused to answer the questions that we asked her on this report. (CM 14)

"Q. At the time the report was made, both at the time you made the arrest and at the time later at the police station, it was your opinion, based upon your experience in viewing people in an intoxicated condition, that the defendant was, both at the time of the arrest and at the time at the police station, intoxicated; is that so?

"A. Yes, sir. (CM 15)

"Q. Did you, or did you not, offer a drunkometer?

"A. Yes, sir, I did. (CM 15)

"Q. Did the defendant, after you had taken her to the police station, or in route there, make any request to you in form of wanting to make a phone call to any specific person. If so, would you tell us about that please?

"A. She requested to make a phone call, to probably her doctor, I don't know for sure.

"Q. Did she ask at any time to be taken to her doctor or to some other place?

"A. She asked that Mr. Starrett be taken to the Tinker Base Hospital, or. to have the doctor come to the station."

*ON CROSS EXAMINATION*, the officer was asked and answered:

"Q. On the particular evening of this arrest as you have previously testified to, did you, to the best of your recollection or memory know whether or not Mrs. Starrett and/or Mr. Starrett made the request to be taken to the Base Hospital to verify their sobriety?

"A. Yes, sir, they both requested that they be taken.

"Q. On the way to the station this request was refused, more as a matter of getting them to the station first, is that right?

"A. Yes, sir, that is left up to the Captain. (CM 17)

"Q. Then, after they were taken to the Midwest City Police Station and informed of what they were to be charged with, did Mrs. Starrett and/or Mr. Starrett again request to be taken to the Base Hospital?

"A. Yes, sir, they did.

"Q. Was it denied?

"A. Yes, sir." (CM 17 & 18)

*ON DIRECT EXAMINATION*, the officer was asked and answered:

"Q. Did they request specifically,. for instance, a blood test, by a doctor to determine the blood alcohol content in their blood?

"A. Yes, sir, they did.

"Q. Did you know, or did they indicate, for what purpose?

"A. They stated that he was having trouble with his stomach; that he was sick; and not intoxicated." (CM 16)·

*ON CROSS EXAMINATION*, the officer was asked and answered:

"Q. Did the defendant, Mrs. Starrett, make the request to call, a private, personal, family physician, for the purpose of his coming to the jail to administer a blood test?

"A. That request was made, yes, sir.

"Q. Was that request denied?

"A. Yes, sir." (CM 18)

ON DIRECT EXAMINATION, the officer was asked and answered:

"Q. These requests were refused by the Midwest City Police Department, is that so?

"A. Yes, sir. (CM 16)

ON CROSS EXAMINATION, the officer was asked and answered:

"Q. Did Mrs. Starrett further request that the desk clerk, or someone on duty call for her? In other words, if she couldn't call herself, did she make the suggestion that the police call the doctor?

"A. Yes, sir, she did.

"Q. And was that request also refused?

"A. As far as I know, yes, sir." (CM 18)

ON DIRECT EXAMINATION, the officer was asked and answered:

"Q. Mrs. Starrett was then incarcerated to your knowledge?

"A. Yes, sir. (CM 16)

"Q. For what period of time was she so incarcerated?

"A. Four hours." (CM 17)

ON CROSS EXAMINATION, the officer was asked and answered:

"Q. To the best of your knowledge, and recollection, was the defendant allowed to make any phone call prior to being released approximately four and one half or five hours later?

"A. At the end of four hours she was offered a chance to make a phone call to whomever she so desired. (CM 18)

"Q. In this four hours * * * would you tell me about the four hours. Why are they placed in the jail for four hours?

"A. State, Law, I believe, states that the four hours is required for a person to sober up.

"Q. Back to the four hours * * * that is the general policy of keeping someone in jail, isn't this generally the case, and especially of drinking drivers, that they will be sober by the time they are released?

"A. Most of the time; yes, sir.

"Q. So in just rough odds, 80 or 90 per cent of the individuals released have been sober and not drunk and would be without any good test of their individual sobriety, because he would be sober?

"A. After he was released, yes."

The question herein to determine is whether or not refusing defendant the right to call her family physician to take a blood test at her own expense constituted a suppression of evidence to bring it within the category of a denial of due process.

The matter to be determined has been squarely passed upon by the Court of California in the case of In re Newbern, 175 Cal.App.2d 862, 1 Cal.Rptr. 80, 79 A.L.R.2d 901 (1959) Whereas the Court said:

"In the case at bar the defendant requests the opportunity to call a doctor of his own choice and at his own expense in an effort to obtain the only evidence that could vindicate him of the charge. This was refused. We cannot but wonder why. If he was drunk as charged, the police would have had the evidence of the blood test to corroborate their opinion. Their refusal tends to cast some doubt upon their opinion and lends credence to the protest of Mr. Newbern. The refusal to permit him to call a doctor was unreasonable and a denial of due process. The petitioner is dicharged."

In the case of State v. Munsey, 152 Me. 198, 127 A.2d 79, the Supreme Court of Me. held:

"If all reasonable efforts fail and no blood sample is in fact procured, no

rights of the respondent are infringed for his right is not to have a test sample taken but only to have reasonable opportunity to attempt to gather the desired evidence. When the respondent is held incommunicado and his request for assistance in procuring a doctor are unreasonably ignored or refused by the detaining officers, it may be said that the respondent is denied the essentials of governmental fair play. Officers charged with law enforcement must always be mindful that the public has as great an interest in the vindication of the innocent as it does in the punishment of the guilty."

The California Court further said in the Newbern case:

"While peace officers and officials connected with detection and prosecution of crime should be diligent in ferreting out and prosecuting the guilty they should be fair with an accused. Evidence pointing to his innocence should not be suppressed. For a guilty man to escape punishment is a miscarriage of justice, but for an innocent man to be convicted is unthinkable."

These holdings in other Jurisdictions are undoubtedly based upon the Constitutional guarantee assuring every person a full and ample opportunity to be heard before he can be deprived of his liberty or property without due process of law. He is entitled to the right to summon witnesses. He is entitled to a fair and impartial trial and the aid of counsel. For a brief period of time after arrest on a charge of being drunk, evidence could be obtained by the taking of a blood test that could serve to exonerate the accused, on the other hand, the evidence may, to the contrary, serve to support the officers in their contentions. While there is no duty or obligation on the part of the officer to acquire for the defendant a doctor to take the test under such circumstances, the defendant is entitled, and should be afforded, the opportunity to call his physician and at his own expense, arrange for the test. The request should be a reasonable request, especially as to time. As pointed out in the Newbern case supra:

"It is a matter of common knowledge that the intoxicating effect of alcohol diminishes with the passage of time. In a matter of a few hours an intoxicated person may 'sober up.' The efficacy of a blood test depends upon its being made as soon as possible after the time of the offense. To be of any probative value the test must be 'near' to the offense in point of time. If it is not taken promptly after the arrest, it proves nothing."

In line with the substance of the above logic and to avoid unreasonable abuse of the right herein recognized, it appears to be practical that the accused should make the request at the time he or she is booked. Upon request to call his or her physician at their own expense for the purpose of taking the test, the right should be afforded by the officers. It should require little inconvenience to permit the accused to use the telephone for that purpose.

In the case of In re Koehne, 54 Cal.2d 757, 8 Cal.Rptr. 435, 437, 356 P.2d 179, 181, the Court said:

"While one accused of being drunk is entitled to a reasonable opportunity to procure timely taking of sample of blood at his own expense, it cannot reasonably be held that, even though such a request is made to arresting officer, it is such officer's duty while escorting prisoner to police call box or otherwise at scene of arrest to permit his prisoner to telephone a physician, and request should be made at police station when arrested person is 'booked' and where telephonic facilities for making such a call are available."

The state advances the argument that the instant case is distinguished from the Newbern case supra in that the defendant was offered an intoxometer (Drunkometer) test and refused to take same, therefore she was entitled to no other rights. With this we cannot agree.

Though the results of an intoxometer (Drunkometer) test has been accepted as evidence to be accorded such weight as the Jury thought it worth, (See Armstrong v. State, Okl.Cr., 300 P.2d 766, also Logan v. State, Okl.Cr., 269 P.2d 380) it is still an instrument in the hands of the police who likely will be the prosecuting witness. Our Court has held that the defendant is not required to take such test and a refusal to take said test cannot be used as Evidence at the trial (see Duckworth v. State, Okl. Cr., 309 P.2d 1103). The refusal to take a drunkometer test in the opinion of your writer, does not bar the right of the accused to a reasonable opportunity to procure the blood test from a Doctor, at his or her own expense.

The Attorney General argues that one essential element of the request for permission to call a physician is the offer to procure the physician at the expense of the accused. That in the case at bar, defendant at no time offered to do so at her own expense. We agree that the request should include the offer to do so at their own expense, but we do not agree that the evidence is negative on this element of the request.

The record reflects the following question by Defendant Counsel propounded to arresting Officer Messick:

"Q. Did the defendant, Mrs. Starrett, make the request to call a private, personal, family physician for the purpose of him coming to the Jail to administer a blood test?

"A. That request was made, yes, sir.

"Q. Was that request denied?

"A. Yes, sir."

It would be absurd to construe the above question and answer negative to the proposition that defendant intended to pay for the service. If defendant had called her personal physician and he had come at her request, no one but she could have been liable for the payment of the service rendered.

Though all doubt would have been removed had she stated "at her own expense".

However, we feel her request as above stated was sufficient to infer it was to be at her expense.

The officer owes no further duty than to permit the accused to use the telephone whereby he may have a reasonable opportunity to attempt to acquire a timely sample. If defendant is afforded the opportunity, and he is unable to procure the test, he is not denied due process. It is only where the accused is denied the opportunity to acquire the test, that he is denied due process.

■ Defendant advances other assignments of error. Little necessity remains to discuss them herein since the first contention of error is ample to require reversal. However, it is well to call attention to the fact that this was an appeal from the City Court of Midwest City for violation of a City Ordinance. The judgment and sentence was appealed to the Common Pleas Court of Oklahoma County. The case was tried de novo; the defendant was convicted and sentenced to pay a fine of $20.00 and $8.80 cost, and default of the payment of costs and fine. "She be further imprisoned in the *County Jail* for a period not exceeding one day for every $1.00 of cost and fine herein or the said time to be served on the *County Roads* of Oklahoma County." The judgment and sentence further states:

"It is further ordered by the Court that the Sheriff of said county immediately proceed to transport the defendant from the court room to the *County Jail* as aforesaid, and safely keep this defendant confined or on the roads as herein set forth".

The judgment and sentence is contrary to statute and is absolutely Void. The Oklahoma Statute 11 O.S.A. § 763 states:

"In all trials upon such appeals, if the defendant be found guilty, the judge of the county court shall render judgment accordingly. Any person so convicted before such court upon such appeal shall be punished by such fine or imprisonment or both as may be prescribed by ordinance, and be assessed by

the verdict of the jury trying such case, which shall include the costs in all courts, or by the court in the event a jury shall be waived. IT SHALL BE A PART OF THE JUDGMENT THAT THE DEFENDANT STAND COMMITTED IN THE CITY JAIL OF THE CITY WHEREIN THE OFFENSE WAS COMMITTED, AND IN THE EVENT THERE BE NO SUCH JAIL THEREIN, THEN IN THE COUNTY JAIL OF THE COUNTY, UNTIL THE JUDGMENT BE COMPLIED WITH."

The transcript clearly reveals that Midwest City has a jail and defendant taken there upon arrest. Upon conviction in the Common Pleas Court from the appeal, defendant should have been sentenced to the city jail in Midwest City. To sentence defendant to the county jail renders the judgment and sentence VOID. However, the writer is of the opinion that in the instant case, defendant was denied due process of law by being denied the opportunity to gather testimony in her defense at the only time it would ever be available.

The case is therefore Reversed and Remanded.

BRETT and BUSSEY, JJ., concur in result.

BUSSEY, Judge.

I concur in the conclusion reached by my colleague, Judge Nix, that the instant case should be reversed and remanded, and agree that the judgment and sentence rendered in the Court of Common Pleas of Oklahoma County, Oklahoma is so defective as to require reversal.

This being true, it is unnecessary to consider the question of whether the arresting officers' failure to allow the accused to place a telephone call to her doctor constituted a denial of due process.

I am authorized by my colleague, Judge Brett, to state that we concur in the results reached by Judge Nix to the extent that such results are based upon the defective judgment and sentence imposed by the Court of Common Pleas of Oklahoma County.

 However, we are of the opinion that the rule stated in United States v. One Hundred Thirty-Nine Gambling Devices, D.C., 109 F.Supp. 23, is applicable herein. In that case the Federal Court said:

"It is well settled that if a case can be disposed of on a nonconstitutional issue without ruling on the constitutional issue involved a ruling on the constitutional issue should be avoided." See Morgan v. United States, D.C., 107 F. Supp. 501.

Therefore, there being other non-constitutional issues, on which the case can be decided, we do not believe that the court should pass upon such constitutional issue at this time.